W. R. Jackson, et al. [1] v. Commissioner. Jackson v. Comm'r
Docket Nos. 70811, 70812, 70813, 70814. United States Tax Court
T.C. Memo 1964-330; 1964 Tax Ct. Memo LEXIS 9; 23 T.C.M. (CCH) 2022; T.C.M. (RIA) 64330; December 23, 1964
*9 Carl A. Swafford, Richard P. Jahn, and William L. Taylor, for the petitioners. George W. Calvert and David E. Mills, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax under section 293(b) of the Internal Revenue Code of 1939 as follows: Addition to
tax under
Docket
Calendar
Sec. 293(b),
No.
Petitioner
Year
Kind of Tax
Deficiency
I.R.C. 1939
70811
W. R. Jackson
1941
Income
$ 7,037.52
$ 3,992.75
1942
Income
12,709.34
6,354.67
1943
Income
194,893.84 *
98,418.14
1944
Income
44,969.77
22,484.89
1945
Income
10,531.13
5,265.57
1946
Income
211.16
105.58
1947
Income
165.63
82.82
70812
William R.
1948
Income
226.16
113.08
Jackson and
Alice J.
1949
Income
402.96
201.48
Jackson
70813
Cleveland
1942
Income
0
32.08
Chair Company
1942
Declared
Value
Excess
219.63
114.10
Profits
1942
Excess
2,517.49
1,211.67
Profits
1943
Declared
Value
Excess
19,920.18
9,960.09
Profits
1943
Excess
152,459.13
76,229.57
Profits
1944
Declared
Value
Excess
2,480.08
1,229.54
Profits
1944
Excess
34,842.66
17,480.59
Profits
1945
Declared
Value
Excess
779.38
341.81
Profits
1945
Excess
15,511.15
7,265.17
Profits
70814
Alice Jewell
1941
Income
2,290.96
880.71
Jackson
1942
Income
7,236.29
3,618.15
1943
Income
155,416.01 *
76,821.33
1944
Income
36,242.25
18,121.12
1945
Income
8,106.89
4,053.45
1946
Income
211.38
105.69
1947
Income
215.84
107.92
*10 At the trial respondent conceded that there were no deficiencies in taxes due from either W. R. Jackson or Alice Jewell Jackson for the calendar year 1941. The issues for decision are: (1) Whether the Federal income tax returns filed by W. R. Jackson and Alice Jewell Jackson for the years 1942, 1943, 1944, and 1945, by W. R. Jackson and Alice Jewell Ajckson for the years 1946 and 1947, by Cleveland Chair Company for 1942 and the declared value excess profits tax returns and excess profits tax returns filed by Cleveland Chair Company for the years 1942, 1943, 1944, and 1945 were each false or fraudulent with intent to evade tax, so that the assessment or collection of a deficiency is not barred by the statute of limitations. (2) Whether the partnership, Jackson Manufacturing Company, consisting of W. R. Jackson and Alice Jewell Jackson, and the corporation, Cleveland Chair Company, had unreported income in each of the years 1942, 1943, 1944, and 1945 as a result of understatement of gross sales; or whether there were additional purchases by each of these businesses in the full amounts by which sales were understated for which no deduction was *11 taken in computing net income. (3) Whether W. R. Jackson and Alice Jewell Jackson in each of the years 1942, 1943, 1944, and 1945 failed to report a portion of their distributable net income from the partnership, Jackson Manufacturing Company, because of understatement of net income of the partnership business on the partnership's return of income for each of those years. (4) Whether W. R. Jackson and Alice Jewell Jackson received income from the Cleveland Chair Company, a corporation, in each of the years 1942, 1943, 1944, and 1945 which was not reported on their Federal income tax returns. (5) Whether W. R. Jackson and Alice Jewell Jackson each failed to report interest income on their individual income tax returns for each of the years 1942, 1943, 1944, 1945, 1946, and 1947; and whether William R. Jackson and Alice Jewell Jackson failed to report interest income on their joint income tax returns for the years 1948 and 1949. (6) Whether there is a deficiency in income tax due from W. R. Jackson for each of the years 1942 through 1947, from Alice Jewell Jackson for each of the years 1942 through 1947, and from William R. Jackson and Alice Jewell Jackson for the years 1948 *12 and 1949; and a deficiency in declared value excess profits tax and excess profits tax due from the Cleveland Chair Company for each of the years 1942 through 1945, a part of which is due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are found accordingly. William R. Jackson and Alice Jewell Jackson, husband and wife who resided in Chattanooga, Tennessee until 1944 or 1945, and thereafter resided in Cleveland, Tennessee, timely filed separate income tax returns with the district director of internal revenue at Nashville, Tennessee for each of the years 1942 through 1947 and joint Federal income tax returns with the same district director of internal revenue for each of the years 1948 and 1949. Each of these returns was prepared by a certified public accountant or a lawyer from records and information furnished to him by William R. Jackson or Alice Jewell Jackson. The Cleveland Chair Company, a Tennessee corporation, timely filed its corporate Federal income tax, excess profits tax, and declared value excess profits tax returns for each of the years 1942 through 1945 with the district director of internal revenue at Nashville, *13 Tennessee. Each of these returns was prepared by a certified public accountant from the books and records of the corporation which were furnished to him. The Cleveland Chair Company was organized in 1915, and in early 1942 W. R. Jackson and Alice Jewell Jackson purchased the stock of this corporation, the stock so purchased being issued 55 percent to W. R. Jackson and 45 percent to Alice Jewell Jackson. W. R. Jackson (hereinafter referred to as Jackson) was born on a farm near Cleveland, Tennessee, in 1906. He was the third oldest in a family of six. After having worked a short while in Cleveland, Ohio, Jackson went to Chattanooga, Tennessee, in 1925 or 1926 and began to do work as a furniture upholsterer. In 1933 Jackson started in business as a sole proprietor under the name of Jackson Upholstery Company, repairing and refinishing furniture. In 1931 Jackson married Alice Jewell. Alice Jewell Jackson (hereinafter referred to as Alice) was working in a hosiery mill in Chattanooga, Tennessee at the time she married Jackson. Her father had died when she was quite young and for a number of years prior to her marriage to Jackson she had been the sole support of herself, her mother, *14 and younger brothers and sisters. Alice continued to work in the hosiery mill for a while after she married Jackson and she also assisted Jackson in his business. Jackson went into bankruptcy in 1933 but subsequently paid off his creditors. Jackson has been in some type of business activity of his own ever since he started the Jackson Upholstery Company. In 1936 Jackson and another organized the Jackson Manufacturing Company as a partnership. This partnership was dissolved before the end of 1936, and from that time until June 30, 1941, Jackson operated the Jackson Manufacturing Company as a sole proprietorship. Jackson Manufacturing Company was in the business of making new furniture, primarily living room suites and upholstered chairs. Alice assisted Jackson in his business in such ways as receiving customers, doing filing, or general office work depending on whore her services were most needed. On June 30, 1941, Jackson gave a 45 percent interest in Jackson Manufacturing Company to Alice, and from that date until its incorporation on January 1, 1946, Jackson Manufacturing Company was operated as a partnership, Jackson being a 55 percent partner and Alice a 45 percent partner. *15 Alice continued to perform substantially the same type of work for the partnership that she had performed while her husband operated the business as a sole proprietorship. One of the reasons that Jackson gave a partnership interest in Jackson Manufacturing Company to Alice was the tax saving which would result from the splitting of the partnership income. Jackson Manufacturing Company timely filed its Federal partnership returns of income for the period July 1, 1941, through December 31, 1941, and for the years 1942, 1943, 1944, and 1945 with the district director of internal revenue at Nashville, Tennessee. These returns for each of the years here involved were prepared by a certified public accountant or a lawyer from workpapers made by such accountant. The formal education of Jackson and Alice each consisted of completion of the Eighth Grade. Neither ever received any formal accounting or bookkeeping training. Jackson and Alice purchased the stock of the Cleveland Chair Company of Cleveland, Tennessee around January 1, 1942, for $80,000. For the purpose of financing this purchase, they borrowed $80,000 from the East Chattanooga Branch of the Hamilton National Bank on a 15-year *16 loan, but repaid the entire amount of the loan to that bank within 7 or 8 months. Throughout the years 1942 through 1945 the stock of the Cleveland Chair Company was owned 55 percent by Jackson and 45 percent by Alice. Jackson and Alice lived about three blocks from the plant of the Jackson Manufacturing Company in Chattanooga, Tennessee until they moved to Cleveland, Tennessee. Prior to the time Jackson and Alice acquired the stock of the Cleveland Chair Company, the business of that company had consisted of the manufacture of furniture. After Alice and Jackson acquired the stock of the Cleveland Chair Company, that company engaged in manufacturing upholstered furniture such as living room suites, chairs, and sofas, similar to the type of furniture manufactured by the partnership, Jackson Manufacturing Company. Each of these companies manufactured furniture in the low and medium price range. In 1938 Jackson hired W. E. Wooten (hereinafter referred to as Wooten) who was then approximately 21 years old, to act as office manager at the Jackson Manufacturing Company. At that time a woman, now deceased, named Cavanaugh, was doing general office work in the offices of Jackson Manufacturing *17 Company and was from time to time assisted by one or two other women employees. Wooten, with the assistance of the women in the office, kept the books of Jackson Manufacturing Company and assisted in buying materials. After Jackson and Alice acquired the stock of the Cleveland Chair Company, the books of that company were kept in Chattanooga at the office of the Jackson Manufacturing Company and Wooten did work in connection with keeping those books. Wooten continued to work for Jackson Manufacturing Company and later for Jackson Manufacturing Company and the Cleveland Chair Company from the time he was employed in 1938 until sometime in April 1944 when he left to go into the United States Navy. From the time Jackson and Alice acquired the stock of the Cleveland Chair Company, Jackson was its president and general manager and Alice was its vice president. Wooten, as well as being office manager for the Cleveland Chair Company, was assistant secretary and treasurer for that company. The office in which Wooten worked and where the basic records of Jackson Manufacturing Company and the Cleveland Chair Company were kept adjoined Jackson's office, and there was a pigeonhole between *18 the two so that Wooten might talk with Jackson without having to go into the adjoining office. Mail of the Jackson Manufacturing Company was received at its office in Chattanooga, Tennessee, and Cleveland Chair Company mail which was received in Cleveland was transmitted to the Chattanooga office for handling. All of the mail and all other records of both businesses were at all times available to Jackson. After acquiring the Cleveeland Chair Company, Jackson spent a substantial portion of his time in Cleveland, Tennessee. Prior to moving to Cleveland, it was Jackson's general practice to go by the office in Chattanooga, Tennessee, each morning and stay an hour or two, then go on to Cleveland, Tennessee, and return in the late afternoon and spend some time at the office or the plant of the Jackson Manufacturing Company in Chattanooga. The bookkeeping work which was generally done by Cavanaugh, was payroll and billing work and entering of orders. The general supervision of the bookkeeping was under Wooten who was responsible to and reported to Jackson. Jackson was fully acquainted with the entire operations of the companies. He regularly checked the records and actively participated *19 in every phase of the businesses including the manufacturing operations and the purchasing of materials. When Wooten left for the service in April 1944, Jackson personally ran the companies' offices until he hired another office manager in 1945. The books and records of the partnership, Jackson Manufacturing Company, and of the corporation, Cleveland Chair Company, were kept on an accrual method of accounting. Jackson and Alice each had a drawing account on the records of the partnership and payment of some of their personal expenses was made from these accounts. The records of the Jackson Manufacturing Company and of the Cleveland Chair Company each contained an accounts receivable sheet for each company with which it did business. In the normal course of operations, when a shipment of furniture was made by either the partnership or the corporation, an invoice with a number of copies was made out to the company purchasing the furniture. These invoices were numbered in sequence with both duplicates bearing the same number as its original. One copy of the invoice would be sent to the purchaser, another was placed in a file from which commissions for the plant manager and salesmen *20 were figured, and another was placed in a file from which the accounts receivable ledger of the company was posted. During the years 1942 through 1945 the office was considerably behind in posting the invoices to the accounts receivable ledger and at times the delay would be from 3 to 5 weeks. The unrecorded invoices were kept in the lower right-hand drawer of Jackson's desk in the Chattanooga office. During the period 1942 through 1945 certain of the materials necessary in the manufacture of furniture became in short supply. At sometime during 1942 a Government regulation prohibited the use of springs in the manufacture of upholstered furniture and Jackson Manufacturing Company and Cleveland Chair Company began to use a heavy duck to substitute for springs. This duck, as well as certain types of lumber used in the manufacture of furniture, could be legally obtained only in the amounts allocated by the Government regulatory agencies charged with such responsibility during the period of World War II. Upholstery material, which from a cost standpoint constituted the major item of material needed in the manufacture of upholstered furniture, did not require a Government allocation *21 in order that it might be purchased but the prices at which such material could be sold were controlled by the Office of Price Administration (hereinafter referred to as OPA), and due to the general scarcity of civilian goods during the war years was not always readily available at the regulated OPA prices in the quantities and qualities that the Jackson Manufacturing Company and the Cleveland Chair Company needed for use in their expanding businesses. The OPA also controlled the prices at which furniture could be sold starting in approximately May 1942, and during the period 1942 through 1945 a scarcity existed in the supply of furniture which created a good demand for the products of the Jackson Manufacturing Company and Cleveland Chair Company. Both companies received payment on most of their accounts receivable during those years within 30 to 60 days and had very few bad debts. In determining the prices at which furniture would be sold both Jackson Manufacturing Company and Cleveland Chair Company used a cost sheet for the basic cost of furniture with a variance depending on the upholstery material to be used on the furniture ranging to around 18 different grades. The prices *22 of the furniture were determined from these cost sheets and although the base price was generally set by the OPA on the standard charged during the month of March 1942, the OPA permitted the price to vary depending upon the amount actually paid by a company for the upholstery material used. On a number of occasions during the years 1942 to 1945 the prices charged by Jackson Manufacturing Company and Cleveland Chair Company for the furniture they manufactured and sold were examined by representatives of the OPA. During the years 1942, 1943, 1944, and 1945, certain invoices representing sales of merchandise which had been made by Jackson Manufacturing Company and Cleveland Chair Company were not recorded on the books and records of each of those companies from which the Federal tax returns were prepared. The checks received in payment of such invoices were likewise not posted to the books and records of the Jackson Manufacturing Company and the Cleveland Chair Company from which the income tax returns were prepared. The certified public accountant who was the auditor for Jackson Manufacturing Company and Cleveland Chair Company, having started to audit books for Jackson's businesses *23 in the mid-1930's, was not informed at the time he made his audits of the books and prepared the workpapers from which the tax returns of the partnership and the corporation were prepared, that these sales had been omitted. The audits made by this accountant were not certified. Jackson was aware that all of the sales made by the Jackson Manufacturing Company and Cleveland Chair Company during the years 1942 through 1945 were not recorded on the books of the respective companies. All of the receipts from the sales which were recorded on the books of the Jackson Manufacturing Company and Cleveland Chair Company were deposited to the respective bank accounts of those companies so that the deposits in each company's bank account reconciled with the sales as shown on the books of that company. In November 1951 respondent's agents who conducted the investigation which led to the deficiencies and additions to tax determined by respondent in the deficiency notices from which the petitions in these cases were filed contacted Jackson in his offices at the Jackson Manufacturing Company in Chattanooga, Tennessee. Jackson had been notified approximately a year prior to that time that he would *24 be contacted with respect to this examination of his return. Respondent had examined the partnership returns of the Jackson Manufacturing Company for the years 1941 through 1943 on a prior occasion. The examination for 1943 was a partial examination, checking certain specific items in the return. Respondent had previously examined the returns of Cleveland Chair Company for the years 1942, 1943, 1944, 1945, and 1946. The examination for 1946 was a partial examination. The books and records used by the accountant who audited the Jackson Manufacturing Company's and Cleveland Chair Company's books, in preparing workpapers from which the returns were prepared were the books which were made available to respondent's agents in these original investigations. The investigating agents were not informed of any sales being omitted from the records used in their investigation. At the time the agents who made the investigation which gave rise to the instant cases contacted Jackson in November 1951, Jackson did not furnish them with any books and records for either Jackson Manufacturing Company or Cleveland Chair Company for the years 1941 through 1946. At that time he advised respondent's agents *25 that the records of both Jackson Manufacturing Company and Cleveland Chair Company for the years 1941 through 1946 had been thrown away or destroyed because they had become damaged by flood water. At that time Jackson did not furnish respondent's agents any personal checks, bank statements, or other personal records, but he did not state that such records had been subject to flood damage. During the course of the investigation in November 1951 Jackson told respondent's agents that all of the transactions of Jackson Manufacturing Company and Cleveland Chair Company had been recorded on the records of the company, except where certain sales invoices had been left off of the sales records, and the checks in payment of these invoices had been cashed at the East Chattanooga Branch of the Hamilton National Bank to obtain funds to make purchases at Black Market premium prices. Jackson further stated to respondent's agents that his accountants did not know about the failure to record certain sales and the cashing of the checks. At that time Jackson told the investigating agents that he had kept an extra set of records showing the sales which were not recorded on the regular books and records *26 of Jackson Manufacturing Company and Cleveland Chair Company from which the respective tax returns had been prepared. Respondent's agents were not furnished at that time or at any later time with this extra set of records. The following schedules show the dates, amounts, and disposition of the proceeds of checks representing payments of sales invoices to Jackson Manufacturing Company which were not deposited to the account of that company during the years 1942, 1943, 1944, and 1945: Deposited to
Cashed but
Date
Amount
Account of
not deposited
1942
June 18
$ 56.00
$ 56.00
June 24
1.18
John Jones
September 9
174.18
John Jones
September 9
7.92
John Jones
October 28
60.00
60.00
October 28
2.77
2.77
Total
$ 382.05
$ 118.77
1943
January 25
$ 14.20
$ 14.20
February 12
402.48
John Jones
February 23
6.00
John Jones
February 26
214.62
214.62
February 27
1,562.96
John Jones
February 27
2,022.72
John Jones
March 4
2,851.24
John Jones
March 4
2,208.33
John Jones
March 4
2,116.80
John Jones
March 18
2,077.60
John Jones
March 18
2,938.44
John Jones
March 18
2.55
John Jones
March 18
2,042.12
John Jones
March 18
134.23
John Jones
March 18
2,510.59
John Jones
March 18
2,563.70
John Jones
March 18
7.35
7.35
March 18
1.20
1.20
March 18
53.92
53.92
March 18
56.74
56.74
March 18
54.39
54.39
March 18
1.20
1.20
April 2
19.05
Jolly Jewell
April 2
30.14
Jolly Jewell
April 2
24.07
Jolly Jewell
April 2
8.00
Jolly Jewell
April 2
26.00
Jolly Jewell
April 2
2,581.69
John Jones
April 2
1,716.96
John Jones
April 2
2,658.31
John Jones
April 2
1,757.21
John Jones
April 2
1,871.02
John Jones
April 30
$ 207.04
$ 207.04
May 22
20.89
John Jones
25.94
John Jones
16.73
John Jones
33.71
John Jones
16.43
John Jones
13.98
John Jones
26.94
John Jones
14.74
John Jones
11.48
John Jones
132.70
John Jones
July 1
18.66
John Jones
July 19
2,199.12
John Jones
July 19
3,782.02
John Jones
July 19
3,012.72
John Jones
July 19
2,240.28
John Jones
July 19
4,045.64
John Jones
July 19
1,549.54
John Jones
July 19
1,787.52
John Jones
July 19
3,669.47
John Jones
July 19
34.24
John Jones
July 20
4,104.14
John Jones
July 20
3,549.46
John Jones
August 27
564.38
W. E. Wooten
10.96
W. E. Wooten
40.91
W. E. Wooten
4,051.24
W. E. Wooten
3,744.32
W. E. Wooten
1,787.52
W. E. Wooten
3,933.13
W. E. Wooten
4,131.84
W. E. Wooten
3,840.82
W. E. Wooten
3,729.49
W. E. Wooten
3,283.02
W. E. Wooten
4,485.26
W. E. Wooten
1,575.84
W. E. Wooten
August 30
1,787.52
1,787.52
September 13
3,698.60
John Jones
September 13
4,151.67
John Jones
September 13
2,759.68
John Jones
September 13
3,724.20
John Jones
September 13
38.40
John Jones
September 13
4,100.12
John Jones
September 13
4.61
John Jones
September 13
42.35
Bertha Jewell
September 21
9.50
9.50
November 23
4,251.24
W. E. Wooten
November 23
4,308.03
W. E. Wooten
November 23
1,850.73
W. E. Wooten
November 23
6,414.64
W. E. Wooten
November 23
3,426.08
W. E. Wooten
December 15
3,792.13
Herbert Jewell
December 15
227.13
Howard Johnson
December 15
2,994.88
Howard Johnson
December 15
4,258.53
Howard Johnson
December 15
3,011.54
Howard Johnson
December 15
4,710.78
Howard Johnson
December 15
3,654.42
Howard Johnson
December 15
3,189.31
Howard Johnson
1943 Total
$166,598.04
$ 2,407.68
1944
January 8
$ 896.19
John Jones
January 31
3,777.63
Ralph Wooten
4,025.41
Ralph Wooten
1,858.08
Ralph Wooten
1,858.08
Ralph Wooten
4,465.65
Ralph Wooten
4,305.63
Ralph Wooten
3,189.31
Ralph Wooten
$ 3,868.65
Ralph Wooten
3,643.33
Ralph Wooten
4,992.71
Ralph Wooten
May 26
3,766.85
$ 3,766.85
December 23
27.50
27.50
1944 Total
$ 40,675.02
$ 3,794.35
1945
April 23
$ 1,561.51
$ 1,561.51
April 23
4,457.35
4,457.35
June 6
2,214.08
2,214.08
1945 Totals
$ 8,232.94
$ 8,232.94
*27 The following schedules show the dates, amounts, and disposition of proceeds of checks representing payments of sales invoices to Cleveland Chair Company which were not deposited to the account of that company during the years 1942, 1943, 1944, and 1945: Deposited to
Cashed but
Date
Amount
Account of
not deposited
1942
July 9
$ 42.48
John Jones
July 24
11.24
John Jones
July 24
477.96
John Jones
July 24
102.60
John Jones
August 7
125.40
John Jones
August 7
31.39
John Jones
August 7
3.75
John Jones
September 9
21.38
John Jones
September 9
15.00
John Jones
November 10
6.91
John Jones
November 10
4.22
John Jones
November 10
1.60
John Jones
November 10
1,716.96
John Jones
December 3
64.56
John Jones
December 3
46.77
John Jones
December 3
25.50
John Jones
December 3
2.00
John Jones
December 3
12.27
John Jones
December 3
33.18
John Jones
December 31
394.20
John Jones
December 31
7.00
John Jones
December 31
49.78
John Jones
December 31
11.75
John Jones
December 31
26.10
John Jones
December 31
16.20
John Jones
December 31
6.71
John Jones
December 31
28.80
John Jones
1942 Total
$ 3,285.69
1943
January 13
$ 22.00
John Jones
January 25
74.70
$ 74.70
January 25
35.00
35.00
January 25
2.50
2.50
1943
February 23
57.54
John Jones
February 23
7.47
John Jones
February 23
17.92
John Jones
February 23
25.48
John Jones
February 23
7.50
John Jones
February 23
36.17
John Jones
March 4
2,065.06
Jolly Jewell
March 4
1,695.44
Jolly Jewell
March 4
606.91
Jolly Jewell
March 4
2,544.04
Jolly Jewell March 4
$ 854.17
Jolly Jewell
March 4
766.28
Jolly Jewell
March 4
1,649.26
Jolly Jewell
March 4
379.84
Jolly Jewell
March 4
371.95
Jolly Jewell
March 18
1,562.90
Jolly Jewell
March 18
2,065.84
Jolly Jewell
March 18
13.59
Jolly Jewell
March 18
7.99
Jolly Jewell
March 18
425.32
Jolly Jewell
March 18
363.04
Jolly Jewell
March 18
361.04
Jolly Jewell
March 18
2,355.72
John Jones
April 26
21.76
Jolly Jewell
May 22
4.60
John Jones
July 1
17.00
John Jones
July 19
180.00
Jolly Jewell
July 19
19.98
Jolly Jewell
July 19
2,395.16
Jolly Jewell
July 19
3,581.32
Jolly Jewell
July 19
3,774.96
Jolly Jewell
July 19
3,998.40
Jolly Jewell
July 19
3,892.56
Jolly Jewell
July 19
2,314.09
Jolly Jewell
July 19
2,293.20
Jolly Jewell
July 27
15,041.57
Jolly Jewell
August 27
2,132.39
Bertha Jewell
August 27
3,955.28
Bertha Jewell
August 27
3,998.40
Bertha Jewell
August 27
3,015.66
Bertha Jewell
August 27
25.49
Bertha Jewell
August 27
3,998.40
Bertha Jewell
August 27
3,916.95
Bertha Jewell
1943
August 27
2,010.96
Bertha Jewell
August 27
4.50
Bertha Jewell
August 27
3,755.56
Bertha Jewell
August 27
3,758.10
Bertha Jewell
August 27
2,757.96
Bertha Jewell
September 13
3,814.00
Bertha Jewell
September 13
3,860.22
Bertha Jewell
September 13
33.96
$ 33.96
September 13
23.20
23.20
October 26
30.00
Howard
Johnson
October 26
314.50
Howard
Johnson
October 26
3,956.53
Howard
Johnson
October 26
2,847.17
Howard
Johnson
October 26
3,943.52
Howard
Johnson
October 26
3,988.60
Howard
Johnson
October 26
2,504.10
Howard
Johnson
October 26
3,072.10
Howard
Johnson
October 26
99.47
Howard
Johnson
November 24
3,073.28
Jolly Jewell
November 24
3,998.40
Jolly Jewell
November 24
3,998.40
Jolly Jewell
November 24
3,998.40
Jolly Jewell
November 24
3,998.40
Jolly Jewell
November 24
3,049.02
Jolly Jewell
December 15
3,810.40
Herbert
Jewell
December 15
3,796.87
Herbert
Jewell
December 15
3,880.80
Herbert
Jewell
December 15
3,998.40
Herbert
Jewell
December 15
2,234.40
Herbert
Jewell
December 15
3,891.38
Herbert
Jewell
December 15
6,820.33
Herbert
Jewell
December 15
9,607.28
Herbert
Jewell
December 15
5,319.52
Herbert
Jewell
December 15
2,010.96
Herbert
Jewell
December 15
19.65
Herbert
Jewell
December 15
1.86
Herbert
Jewell
December 15
$ 3,073.28
Herbert
Jewell
December 15
3,881.90
Herbert
Jewell
December 15
3,781.04
Herbert
Jewell
December 15
3,073.28
Herbert
Jewell
December 15
3,073.28
Herbert
Jewell
1943 Total
$202,116.82
$ 169.36
1944
January 8
$ 2,283.01
Jolly Jewell
January 8
3,901.73
Jolly Jewell
January 8
2,895.12
Jolly Jewell
January 8
6,379.21
Jolly Jewell
January 8
7,505.78
Jolly Jewell
January 8
3,880.80
Jolly Jewell
January 8
2,162.66
Jolly Jewell
January 8
3,909.12
Jolly Jewell
March 15
38.60
$ 38.60
March 18
38.60
38.60
March 18
32.00
32.00
March 18
60.34
60.34
May 1
13.50
13.50
May 26
18.00
18.00
September 12
4,458.62
4,458.62
1944 Totals
$ 37,577.09
$ 4,659.66
1945
February 5
$ 40.92
$ 40.92
April 23
1,485.88
1,485.88
April 23
2,015.38
2,015.38
June 6
450.00
450.00
June 6
1,835.68
1,835.68
July 23
412.80
412.80
July 23
68.20
68.20
September 6
2,872.77
2,872.77
September 14
195.65
195.65
September 14
965.62
965.62
September 14
1,306.33
1,306.33
October 12
40.63
40.63
1945 Total
$ 11,689.86
$11,689.86
*28 All of the checks set forth in the two preceding schedules were drawn on out-of-town banks and were listed on transit letters going from the East Chattanooga Branch of the Hamilton National Bank to the main branch. Some of these checks which were not deposited to the accounts of Jackson Manufacturing Company and Cleveland Chair Company cleared on days when deposits had been made to the accounts of these businesses at the East Chattanooga Branch of the Hamilton National Bank and some cleared on days when no such deposits were made. The accounts at the East Chattanooga Branch of the Hamilton National Bank in the names of Jolly Jewell, Herbert Jewell, Bertha Jewell, John Jones, Howard Johnson, Ralph Wooten, Roe Isbill, Jim Jolly, W. E. Wooten and W. R. Jackson, Thomas Rogers, Samuel Jackson, Melvin Lee, and W. E. Wooten to which these checks were deposited were savings accounts. The name "Jewell" is Alice's maiden name. Alice had a sister whose name was Jolly Jewell. Jackson had a brother named Melvin Lee Jackson. The Jacksons had a son named Roger Thomas Jackson. When the schedules of the out-of-town checks of the Jackson Manufacturing Company and Cleveland Chair Company which were *29 not deposited to the accounts of those businesses were prepared, there were many of the transit letters of the East Chattanooga Branch of the Hamilton National Bank which were not made available to the agents of respondent who prepared the schedules because they could not be located by the officials of the bank so that if any checks of either Jackson Manufacturing Company or Cleveland Chair Company were listed on such transit letters they are not included in the schedules heretofore set forth. The East Chattanooga Branch of the Hamilton National Bank did not keep records of the local Chattanooga checks cashed by it and therefore if any such checks of either Jackson Manufacturing Company or Cleveland Chair Company were not deposited to the respective accounts of those businesses, the bank records would not show any detail of such checks. Some but not all of the deposit slips for the various savings accounts to which checks of the Jackson Manufacturing Company and Cleveland Chair Company were deposited were placed in evidence at the trial. These deposit slips were in the handwriting of E. C. Dodd, the then manager of the East Chattanooga Branch of the Hamilton National Bank. The balance *30 of such deposit slips could not be located by the officials of that bank. It is not uncommon for a bank employee or official to prepare a deposit slip for a client of the bank. The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled "Jolly Jewell" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
Mar. 4
$10,932.95
$ 10,932.95
Checks endorsed by Cleveland
Chair
Co.
Mar. 16
300.70
11,233.65
Unidentified
Mar. 18
4,799.72
16,033.37
Checks endorsed by Cleveland
Chair
Co.
Apr. 2
209.66
16,243.03
$102.40 unidentified; bal.
checks
cashed by W. R. Jackson
Apr. 26
296.44
16,539.47
$125 check endorsed by W. R.
Jack-
son; $21.76 check endorsed by
Cleveland Chair Co.; balance
un-
identified
May 5
312.08
16,851.55
Unidentified
May 22
184.01
17,035.56
Unidentified
July 1
38.60
17,074.16
Interest credit
July 19
22,694.87
39,769.03
$245.20 unidentified; balance
checks
endorsed by Cleveland Chair
Co.
July 20
$ 9,769.03
30,000.00
July 27
17,828.56
47,828.56
$15,041.57 checks endorsed by
Cleve-
land Chair Co.; balance
unidenti-
fied
Nov. 24
22,115.90
69,944.46
Checks endorsed by Cleveland
Chair
Co.
1944
Jan. 1
162.25
70,106.71
Interest credit
Jan. 8
32,917.43
103,024.14
Checks endorsed by Cleveland
Chair
Co.
Apr. 1
100,000.00
3,024.14
Apr. 3
3,014.14
10.00
July 1
257.50
267.50
Interest credit
July 3
267.50
0
*31 The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled "Herbert Jewell" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
Nov. 15
[*] [*] $3,792.13 checks endorsed by
Jack-
son Mfg. Co.; balance checks en-
dorsed by Cleveland Chair Co.
1944
Apr. 6
$ 30,000.00
36,066.26
Apr. 29
10,000.00
26,066.26
July 1
230.30
26,296.56
Interest credit
Sept. 15
15,000.00
11,296.56
Sept. 23
500.00
10,796.56
Sept. 27
1,500.00
9,296.56
1945
Jan. 1
46.45
9,343.01
Interest credit
July 1
46.70
9,389.71
Interest credit
1946
Jan. 1
46.95
9,436.66
Interest credit
Apr. 10
9,436.66
0
The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled "Bertha Jewell" with a notation as to the source of the deposits. Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
July 20
$ 9,769.03
Transferred from Jolly Jewell ac-
count
Aug. 27
33,329.65
Checks endorsed by Cleveland Chair
Co.
Sept. 13
7,716.57
$42.35 check endorsed by Jackson
Mfg. Co.; balance, checks en-
dorsed by Cleveland Chair Co.
Oct. 26
20,562.87
Checks endorsed by Jackson Mfg.
Co.
*32 The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled "John Jones" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1942
June 17
$ 5,708.00
$ 5,708.00
$5,539.65 transferred from
Wooten
& Jackson account. Balance un-
identified
July 2
49.75
5,757.75
Unidentified
July 2
173.19
5,930.94
$56.73 check endorsed by
Jackson
Mfg. Co.; $42.46 check endorsed
by Cleveland Chair Co.; balance
unidentified
July 8
42.00
5,972.94
Unidentified
July 13
1,777.71
7,750.65
Unidentified
July 22
178.61
7,929.26
Unidentified
July 24
595.48
8,524.74
$2.50 unidentified; $1.18 check
en-
dorsed by Jackson Mfg. Co.;
bal-
ance check endorsed by
Cleveland
Chair Co.
Aug. 7
176.54
8,701.26
$16.00 unidentified; balance
checks
endorsed by Cleveland Chair Co.
Aug. 17
96.68
8,797.96
Unidentified
Sept. 2
554.57
9,352.53
Unidentified
Sept. 4
30.24
9,382.77
Unidentified
Sept. 9
277.88
9,660.65
$36.40 unidentified; $36.38
checks en-
dorsed by Cleveland Chair Co.;
$174.10 checks endorsed by
Jack-
son Mfg. Co.; $23.00 check en-
dorsed by W. R. Jackson
Sept. 28
413.80
10,074.45
Unidentified
Oct. 13
2,127.04
12,201.49
Unidentified
Oct. 13
195.00
12,396.49
Unidentified
Nov. 10
3,388.69
15,785.18
$1,659.00 unidentified; balance
checks
endorsed by Cleveland Chair Co.
Nov. 24
1,659.97
17,445.15
Unidentified
Dec. 3
2,280.96
19,726.11
$2,074.45 unidentified; $55.41
checks
endorsed by W. R. Jackson; bal-
ance checks endorsed by
Cleveland
Chair Co.
Dec. 14
738.48
20,464.59
Unidentified
Dec. 14
666.15
21,130.74
Unidentified
Dec. 23
290.00
21,420.74
Unidentified
Dec. 31
2,180.98
23,601.72
$1,640.44 unidentified; $28.80
check
endorsed by W. R. Jackson; bal.
checks endorsed by Cleveland
Chair Co.
1943
Jan. 1
40.10
23,641.82
Interest credit
Jan. 9
$ 23,000.00
641.82
Jan. 13
354.33
996.15
$22.00 check endorsed by
Cleveland
Chair Co.; balance unidentified
Jan. 13
$22,977.00
$ 23,973.15
Redeposit of funds withdrawn
for
short-term bonds
Feb. 12
1,453.01
25,426.16
$930.48 check endorsed by Ray
Jack-
son; $402.48 check endorsed by
Jackson Mfg. Co.; balance un-
identified
Feb. 23
782.89
26,209.05
$342.46 unidentified; $6.00
check en-
dorsed by Jackson Mfg. Co.;
$282.35 checks endorsed by W.
R.
Jackson; balance endorsed by
Cleveland Chair Co.
Feb. 27
5,456.15
31,665.20
$1,870.47 unidentified; balance
checks
endorsed by Jackson Mfg. Co.
Mar. 4
7,176.37
38,841.57
Checks endorsed by Jackson Mfg.
Co.
Mar. 12
5,000.00
43,841.57
Unidentified
Mar. 16
454.34
44,295.91
$18.34 check endorsed by W. R.
Jackson; balance unidentified
Mar. 18
14,624.95
58,920.86
$2,355.72 check endorsed by
Cleve-
land Chair Co.; balance checks
endorsed by Jackson Mfg. Co.
Apr. 2
11,651.27
70,572.13
$1,066.08 unidentified; balance
checks
endorsed by Jackson Mfg. Co.
Apr. 12
5,000.00
75,572.13
Unidentified
Apr. 26
1,095.00
76,667.13
Unidentified
May 5
350.00
77,017.13
Unidentified
May 10
1,500.00
78,517.13
Unidentified
May 12
3,378.39
81,895.52
Unidentified
May 22
979.86
82,875.38
$661.72 unidentified; $4.60
check en-
dorsed by Cleveland Chair Co.;
balance checks endorsed by
Jack-
son Mfg. Co.
June 3
4,100.00
86,975.38
Unidentified
July 1
230.00
87,205.38
Interest credit
July 1
1,831.05
89,036.43
$1,750.93 unidentified; $17.00
check
endorsed by Cleveland Chair
Co.;
$18.66 check endorsed by
Jackson
Mfg. Co.; balance checks
endorsed
by W. R. Jackson
July 19
24,578.04
113,614.47
$2,257.49 unidentified; balance
checks
endorsed by Jackson Mfg. Co.
July 20
7,653.60
121,268.07
Checks endorsed by Jackson Mfg.
Co.
July 20
$ 91,268.07
30,000.00
Aug. 12
2,000.00
28,000.00
Sept. 13
18,477.28
46,477.28
Checks endorsed by Jackson Mfg.
Co.
Oct. 4
2,000.00
44,477.28
Nov. 26
20,000.00
24,477.28
1944
Jan. 1
130.80
24,608.08
Interest credit
Jan. 8
8,516.52
33,124.60
$7,620.33 unidentified; balance
checks
endorsed by Jackson Mfg. Co.
July 1
165.50
33,290.10
Interest credit
1945
Jan. 1
166.45
33,456.55
Interest credit
Feb. 8
10,000.00
23,456.55
July 1
117.25
23,573.80
Interest credit
July 12
1,000.00
24,573.80
Unidentified (apparently error
in
posting)
1946
Jan. 1
117.80
24,691.60
Interest credit
Jan. 9
24,000.00
691.60
Jan. 12
23,976.00
1,000.00
23,667.60
Redeposit of funds withdrawn
for
short-term bonds.
130.80
23,536.80
July 1
117.68
23,654.48
Interest credit
1947
Jan. 1
$ 118.25
$ 23,772.73
Interest credit
Jan. 9
$ 23,500.00
272.73
Jan. 13
23,476.50
23,749.23
Redeposit of funds withdrawn
for
short-term bonds.
July 1
118.75
23,867.98
Interest credit
Nov. 8
9,258.46
14,009.52
Nov. 14
9,258.46
23,867.98
Unidentified (apparently error
in
posting)
1948
Jan. 1
119.30
23,987.28
Interest credit
Jan. 9
23,500.00
487.28
Jan. 15
23,476.50
23,963.78
Redeposit of funds withdrawn
for
short-term bonds.
July 1
119.80
24,083.58
Interest credit
1949
Jan. 1
120.40
24,203.98
Interest credit
July 1
121.00
24,324.98
Interest credit
July 21
5,000.00
19,324.98
July 22
10,000.00
9,324.98
July 26
5,000.00
4,324.98
July 29
4,000.00
324.98
July 30
324.98
0
*33 The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Howard Johnson" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
July 20
$16,268.07
$ 16,268.07
Transfer from John Jones
account
Oct. 26
23,218.03
39,486.10
$2,462.04 unidentified;
balance checks
endorsed by Cleveland Chair
Co.
Nov. 26
$ 30,000.00
9,486.10
Dec. 15
22,046.59
31,532.69
Checks endorsed by Jackson
Mfg.
Co.
1944
Jan. 1
23.70
31,556.39
Interest credit
July 1
157.60
31,713.99
Interest credit
Oct. 17
20,000.00
11,713.99
1945
Jan. 1
108.50
11,822.49
Interest credit
July 1
59.10
11,881.59
Interest credit
1946
Jan. 1
59.40
11,940.99
Interest credit
Jan. 9
11,000.00
940.99
Jan. 12
10,989.00
11,929.99
Redeposit of funds withdrawn
for
short-term bonds
July 1
59.64
11,989.63
Interest credit
1947
Jan. 1
59.95
12,049.58
Interest credit
Jan. 9
12,000.00
49.58
Jan. 13
11,988.00
12,037.58
Redeposit of funds withdrawn
for
short-term bonds
July 1
60.15
12,097.75
Interest credit
1948
Jan. 1
60.45
12,158.18
Interest credit
Jan. 9
12,000.00
158.18
Jan. 15
11,988.00
12,146.18
Redeposit of funds withdrawn
for
short-term bonds
July 1
60.70
12,206.88
Interest credit
1949
Jan. 1
61.00
12,267.88
Interest credit
July 1
61.30
12,329.18
Interest credit
July 21
5,000.00
7,329.18
July 29
6,000.00
1,329.18
July 30
1,329.18
0
*34 The following schedule shows the deposits and balances in an account at the East Chattanooga Branch of the Hamilton National Bank entitled, "W. E. Wooten" with a notation as to the source of the deposits: Date
Deposit
Balance
Source of deposit
1943
Aug. 27
$60,178.73
$60,178.73
$25,000.00 transferred from Thomas Rogers
ac-
Nov. 23
20,250.72
80,429.45
count; balance checks endorsed by Jackson
Mfg. Co.
Checks endorsed by Jackson Mfg. Co.
On January 31, 1944, checks in the amount of $35,984.48, endorsed by the Jackson Manufacturing Company, were deposited to an account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Ralph Wooten." The following schedule shows the deposits, withdrawals, and balances in an account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Roe Isbill" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of
Deposit
1944
Sept. 15
$12,000.00
$ 12,000.00
Apparently
transferred
from Her-
bert Jewell
account
Dec. 11
$ 10,298.13
1,701.87
1945
Jan. 1
4.25
1,706.12
Interest
credit
July 1
8.50
1,714.62
Interest
credit
1946
Jan. 1
8.55
1,723.17
Interest
credit
Apr. 10
1,723.17
0
*35 The following schedule shows the deposits, withdrawals, and balances in an account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Jim Jolly" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1944
Sept. 15
$12,000.00
$ 12,000.00
Unidentified
Oct. 10
$ 2,270.19
9,729.81
1945
Jan. 1
24.30
9,754.11
Interest credit
July 1
48.75
9,802.86
Interest credit
July 17
4,500.00
5,302.86
1946
Jan. 1
26.50
5,329.36
Interest credit
Apr. 10
5,329.36
0
The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled, "W. E. Wooten and W. R. Jackson" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1942
Mar. 25
$ 107.25
$ 107.25
Unidentified
Mar. 27
71.01
178.26
Unidentified
Apr. 6
207.50
385.76
Unidentified
Apr. 10
101.44
487.20
Unidentified
Apr. 15
231.23
718.43
Unidentified
Apr. 17
300.00
1,018.43
Unidentified
May 5
246.94
1,265.37
Unidentified
May 21
$ 272.04
$ 1,537.41
Unidentified
May 26
196.30
1,733.71
Unidentified
June 5
559.94
2,293.65
Unidentified
June 10
3,246.00
5,539.65
Check endorsed by W. R.
Jackson
June 17
$ 5,539.65
0
*36 The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Thomas Rogers" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of
Deposit
1943
July 20
$25,000.00
$ 25,000.00
Transferred
from the John
Jones
account
Aug. 27
$ 25,000.00
0
The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Samuel Jackson" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
July 20
$25,000.00
$ 25,000.00
Transferred from the John
Jones
account
Aug. 27
$ 25,000.00
0
The following schedule shows the deposits, withdrawals, and balances in the account at the East Chattanooga Branch of the Hamilton National Bank entitled, "Melvin Lee" with a notation as to the source of the deposits: Date
Deposit
Withdrawal
Balance
Source of Deposit
1943
July 20
$25,000.00
$ 25,000.00
Transferred from the John
Jones
account
Aug. 27
$ 25,000.00
0
*37 The following schedule shows the clearing date, amount, last endorsement, and disposition of proceeds of certain checks endorsed by W. R. Jackson, Ray Jackson, and Lee Jackson which were cashed at the East Chattanooga Branch of the Hamilton National Bank during the years 1942, 1943, 1944, and 1945. Cashed
Last Endorse-
Deposited to
But Not
Clearing
Amount
ment By
Account of
Deposited
Date
1942
June 10
$3,246.00
W. R. Jackson
Wooten and
Jackson
September 9
23.00
W. R. Jackson
John Jones
December 3
3.37
W. R. Jackson
John Jones
December 3
18.86
W. R. Jackson
John Jones
December 3
33.18
W. R. Jackson
John Jones
December 31
28.80
W. R. Jackson
John Jones
Total
$3,353.21
1943
January 25
$ 7.92
[1] Lee Jackson $ 7.92
February 12
1,453.01
[2] Ray Jackson John Jones
February 23
282.35
W. R. Jackson
John Jones
March 16
18.34
W. R. Jackson
John Jones
April 2
19.05
W. R. Jackson
Jolly Jewell
1943
April 2
$ 30.14
W. R. Jackson
Jolly Jewell
April 2
24.07
W. R. Jackson
Jolly Jewell
April 2
8.00
W. R. Jackson
Jolly Jewell
April 2
26.00
W. R. Jackson
Jolly Jewell
April 26
125.00
W. R. Jackson
Jolly Jewell
July 1
20.04
W. R. Jackson
John Jones
July 1
24.42
W. R. Jackson
John Jones
July 20
200.00
W. R. Jackson
$ 200.00
September 21
4.61
W. R. Jackson
4.61
September 21
38.40
W. R. Jackson
38.40
Total
$2,281.35
$ 250.93
1944
February 25
$1,993.79
W. R. Jackson
$1,993.79
April 17
13.50
Ray Jackson
13.50
Total
$2,007.29
$2,007.29
1945
March 7
$ 49.75
Ray Jackson
$ 49.75
April 23
38.45
Ray Jackson
38.45
April 23
30.68
W. R. Jackson
30.68
Total
$ 118.88
$ 118.88
*38 All of the checks which have been identified as those of Jackson Manufacturing Company or Cleveland Chair Company in explaining the deposits to the various accounts under the names of Jolly Jewell, Herbert Jewell, Bertha Jewell, John Jones, and the other names as heretofore set forth, were checks issued by the purchasers of products of Jackson Manufacturing Company or Cleveland Chair Company in payment for products shipped by the respective company to such purchasers. Both Jackson and Alice had personal checking accounts at the East Chattanooga Branch of the Hamilton National Bank, separate and apart from the account of the Jackson Manufacturing Company, and Alice also had a savings account at the East Chattanooga Branch of the Hamilton National Bank. Jackson also had a checking account for approximately a 6-month period during 1943 at the East Chattanooga Branch of the Hamilton National Bank entitled, "W. R. Jackson Special Account." On August 12, 1943, a $2,000 deposit *39 was made to the W. R. Jackson special checking account at the East Chattanooga Branch of the Hamilton National Bank with funds withdrawn on the same date from the account entitled, "John Jones." On October 4, 1943, a $2,000 deposit was made to the W. R. Jackson special checking account at the East Chattanooga Branch of the Hamilton National Bank with funds withdrawn on the same date from the account entitled, "John Jones." On November 26, 1943, a $50,000 deposit was made to W. R. Jackson's checking account at the East Chattanooga Branch of the Hamilton National Bank. The funds for this deposit consisted of $20,000 withdrawn on the same date as the deposit was made from the account entitled, "John Jones" and $30,000 withdrawn on the same date from the account entitled, "Howard Johnson." On November 26, 1943, Jackson and Alice purchased a farm for the amount of $42,500 and some adjacent land for $7,500. The check for these purchases was drawn on W. R. Jackson's checking account at the East Chattanooga Branch of the Hamilton National Bank. On or about November 30, 1944, Jackson purchased from the Jack M. Bass Company at a cost of $10,298.13 certain 2 3/4 percent Roane County refunding *40 bonds. In payment for the bonds Jack M. Bass Company drew a $10,298.13 sight draft on the Merchants Bank at Cleveland, Tennessee. The sight draft was paid by cashier's check number 12628 in the amount of $10,298.13 issued by the East Chattanooga Branch of the Hamilton National Bank to the Merchants Bank on December 5, 1944. The funds to cover the cashier's check so issued were withdrawn from the Roe Isbill account. On April 1, 1944, a $100,000 deposit was made to the account of Cleveland Chair Company at the East Chattanooga Branch of the Hamilton National Bank. This deposit consisted of a transfer of $100,000 from the Jolly Jewell account on the same day the deposit was made. As a result of the deposit of $100,000 to the Cleveland Chair Company's account, Jackson and Alice were issued additional stock of the Cleveland Chair Company in the amount of $100,000. On February 13, 1945, W. R. Jackson opened a personal account in his name at the Sears Community State Bank, Chicago, Illinois. The initial deposit was in the amount of $10,000 and was represented by cashier's check number 12755 issued by the East Chattanooga Branch of the Hamilton National Bank, Chattanooga, Tennessee, on *41 February 8, 1945, payable to the Sears Community State Bank. The funds for the payment of the cashier's check were withdrawn on February 8, 1945, from the account entitled, "John Jones." There were no other deposits or credits to, or withdrawals from, the personal account of W. R. Jackson at the Sears Community State Bank from the date that it was opened until it was closed on April 18, 1952, at Jackson's request. The bank issued cashier's check number 87062 in the amount of $10,000, dated April 18, 1952, payable to Jackson in order to close the account. This cashier's check had not been presented for payment and was still outstanding on January 10, 1962. On May 3, 1944, Jackson opened a savings account at the Exchange Bank of St. Augustine, St. Augustine, Florida, with a deposit of $50,000. Of this deposit $40,000 consisted of proceeds of a loan and $10,000 represented that portion of a $10,300 cashier's check issued by the East Chattanooga Branch of the Hamilton National Bank on May 1, 1944, payable to the Exchange Bank of St. Augustine. The remaining $300 of this cashier's check was used to pay the interest for 90 days in advance on the $40,000 loan. The amount of $10,000 *42 had been withdrawn from the Herbert Jewell account on April 29, 1944. Jackson pledged the $40,000 savings account as collateral for the loan of $40,000 from the St. Augustine Bank and did not withdraw this amount until August 9, 1944, when he drew a $40,000 check on this savings account payable to the Exchange Bank of St. Augustine to pay the $40,000 note which became due on August 3, 1944. On October 16, 1945, Jackson withdrew $10,083.33 from his savings account number XXXX at the Exchange Bank of St. Augustine by check dated October 1, 1945, payable to the Rome Bank and Trust Company, Rome, Georgia, which amount was used to open a savings account in Jackson's name at the Rome Bank and Trust Company, Rome, Georgia. During the years 1944, 1945, and 1946, the Exchange Bank of St. Augustine credited interest to the savings account in Jackson's name in the amounts of $83.33, $100.97, and $1.00, respectively. The account in the Rome Bank and Trust Company, Rome, Georgia, opened in Jackson's name on October 16, 1945, was closed on March 16, 1950. During the time the account was in existence interest was credited thereto in the following amounts: Date
Amount
December 28, 1945
$25.31
June 27, 1946
50.54
December 31, 1946
50.79
June 30, 1947
51.04
December 31, 1947
51.30
June 30, 1948
51.56
December 31, 1948
51.81
June 30, 1949
52.07
December 31, 1949
52.33
*43 Alice received the following amounts as interest on a savings account in her name at the East Chattanooga Branch of the Hamilton National Bank: Date
Amount
January 1, 1942
$ 7.15
July 1, 1942
20.15
January 1, 1943
14.30
July 1, 1943
35.50
January 1, 1944
49.00
July 1, 1944
50.15
Jackson received $12.90 interest on a savings account at the East Chattanooga Branch of the Hamilton National Bank as of January 1, 1942. After the entry of the United States into World War II in late 1941, and particularly after the price regulations of OPA became applicable to materials Jackson Manufacturing Company and Cleveland Chair Company were purchasing, in approximately May 1942, the two companies experienced increasing difficulty in obtaining sufficient materials to manufacture the amount of furniture which they were able to sell. Jackson and Wooten discussed this increasing difficulty and came to the conclusion that they would purchase certain scarce material on the "Black Market" for cash. The major item which Jackson Manufacturing Company and Cleveland Chair Company had difficulty in obtaining was upholstery material. There was also some difficulty *44 in obtaining lumber. In the case of lumber, Jackson Manufacturing Company and Cleveland Chair Company sometimes were able to obtain lumber from suppliers without cash payments, but on regular invoices paid by company check by having the lumber invoiced at a higher grade than the lumber that was actually shipped. Thus, the supplier would obtain for the lower grade of lumber the price applicable to the higher grade, but the transaction would appear as a regular transaction for the higher grade of lumber on Jackson Manufacturing Company's or Cleveland Chair Company's books of account. When purchases for Jackson Manufacturing Company and Cleveland Chair Company on the Black Market were first made for cash, the cash to purchase the items was obtained by cashing checks on the company's bank account and purchasing the items with the cash thus obtained. The accountant who audited the books of Jackson Manufacturing Company and Cleveland Chair Company suggested to Jackson that the respective companies stop the practice of writing checks to cash. Jackson and Wooten then discussed the method of obtaining the cash for purchases without drawing cash from the regular company bank accounts so that *45 the withdrawal would show on the company records. It was decided that certain checks which would be received by Jackson Manufacturing Company and Cleveland Chair Company in payment for merchandise would be cashed and the sales represented by these checks would not be entered on the accounts receivable ledger or in the gross sales of the respective company. In order that the girls posting the books in the office would not question the transactions, it was decided that when checks came in for invoices which had not yet been posted to the accounts receivable ledger but were in the bottom drawer of Jackson's desk at the Chattanooga office, the invoices that the check was in payment of would be pulled out of the stack of unposted invoices from which the girls posted and would never be posted to the accounts receivable ledger. Jackson decided that Wooten should be able to cash some of the customers' checks which were made payable to Jackson Manufacturing Company or Cleveland Chair Company without such checks being deposited in the regular accounts of the two companies. Jackson therefore arranged with E. C. Dodd (hereinafter referred to as Dodd) who was manager of the East Chattanooga Branch *46 of the Hamilton National Bank at Chattanooga, Tennessee, for Wooten to be permitted to cash checks drawn to Jackson Manufacturing Company and Cleveland Chair Company and to receive the proceeds in cash. These checks would have the regular company endorsement thereon. When Wooten cashed checks in this manner, he would attempt to take checks that would total exactly the amount he would need to make the contemplated cash purchases. On certain occasions in anticipation of needing cash, he would take checks to the bank a day or two ahead of the date of the contemplated purchases and ask Dodd to hold the cash for a day or two until he called for it. The Black Market purchases made by Wooten in this manner never exceeded $25,000 at any one time, and the total amount spent in this manner by Wooten from the time he began to make purchases in this manner in late 1942 until the first of April 1944, when he went into the United States Navy, for the combined Black Market purchases for Jackson Manufacturing Company and Cleveland Chair Company was between $75,000 and $100,000. When the total checks which Wooten pulled would be more than the amount he paid for the materials purchased on the Black *47 Market, he would take the remaining cash and purchase drapery material to use for upholstery material, or upholstery material at the regular department stores in Chattanooga, such as J. C. Penny. The materials purchased in this manner were legitimate purchases at the regular OPA prices at the department stores and would vary from very small amounts on certain occasions to as much as $400 for such material on other occasions. The accountant who audited the books of Jackson Manufacturing Company and Cleveland Chair Company was not informed of the amounts which were not posted to the accounts receivable ledgers or included in gross sales, or that cash was received for checks representing such sales and used for purchases at Black Market prices. Wooten would regularly give Jackson an accounting of the company checks which he had cashed and the items for which the cash had been expended with some form of receipt from the person to whom the payment had been made. When Wooten entered the military service around the first of April 1944, he advised Jackson that all amounts of cash that he had obtained had been properly accounted for. Shortly after Wooten went into the military service, *48 a customer billed by either Jackson Manufacturing Company or Cleveland Chair Company with a follow-up invoice informed Jackson that such invoice had been previously paid. Jackson immediately called in the companies' accountant to check the accounts receivable ledgers of the two companies to determine whether there were inaccuracies therein. Jackson wrote a letter to Wooten which Wooten interpreted to suggest that he might have taken for his own use cash from checks received in payment for goods by the companies. The accountant circularized the accounts receivable as shown on the books of the Jackson Manufacturing Company and the Cleveland Chair Company and determined that such accounts were overstated by approximately $43,000. The accountant did not have his workpapers at the time of the trial and did not know what adjustment if any was made on the companies' books. When Wooten returned on leave shortly after he entered the military service, he discussed the $43,000 shortage in the accounts receivable of the two companies with Jackson. After Wooten went into the service Jackson personally handled all purchasing for both Jackson Manufacturing Company and Cleveland Chair Company until *49 sometime in 1945 when he hired a man named Bill Randolph to work for the companies. Both during the time that Wooten was with Jackson Manufacturing Company and Cleveland Chair Company and thereafter, Jackson himself withheld from posting to the accounts receivable ledgers, certain invoices and diverted the proceeds of the customers' checks in payment therefor from the businesses of Jackson Manufacturing Company and Cleveland Chair Company so that the amounts thereof were not included in the gross sales of either of the companies, but he did not use any of the amounts so diverted for the purchase of materials for the two companies. In determining the price which could be charged for various items of furniture manufactured and sold by Jackson Manufacturing Company and Cleveland Chair Company, the cost of upholstery material used was the Black Market price actually paid in instances where such material had been purchased at a Black Market price, and any such material in inventory at the date an inventory was taken was placed in inventory at the Black Market price actually paid. The following schedule shows a comparison of the percentage of net income to net sales of furniture manufacturers *50 according to certain statistical compilation with similar percentages of Jackson Manufacturing Company and Cleveland Chair Company: 1941
1942
1943
1944
1945
1946
1947
1948
1949
Dun & Bradstreet
- Furniture
Manufac-
turers (over 100
3.10
2.71
3.31
4.63
4.52
5.82
5.24
concerns each
year)
Southern
Furniture
Manufacturers'
Asso-
ciation (before
6.38
5.42
6.19
6.46
8.53
taxes)
Jackson
Manufacturing
Company: Per the
partnership
return of income
(before taxes)
4.52
9.46
9.57
13.99
12.71
23.25
15.80
As determined by
respondent in
the
notice of
7.53
12.87
27.02
17.40
13.22
deficiency
(before taxes)
Cleveland Chair
Company: Per the
corporate return
of income
(before taxes)
4.32
3.72
6.61
8.04
10.27
15.21
16.32
17.58
12.83
As determined by
respondent in
the
notice of
4.19
21.33
10.60
10.83
deficiency
(before taxes)
During the period from 1936 through 1945, Dodd was the manager of the East Chattanooga Branch of the Hamilton National Bank. In 1946 Dodd was transferred to a bank in Cedartown, Georgia, where he was for a short period *51 before returning to the East Chattanooga Branch of the Hamilton National Bank where he remained until his resignation on February 1, 1950. Jackson first met Dodd in 1936 when the Jackson Manufacturing Company's operations in East Chattanooga, Tennessee were commenced. Jackson and Dodd frequently had lunch together but were not otherwise friends socially. Jackson borrowed money from time to time from the East Chattanooga Branch of the Hamilton National Bank, and Dodd handled these transactions for Jackson, as well as miscellaneous other financial transactions. Jackson trusted Dodd and accepted advice from him on financial matters. Dodd and Jackson would from time to time do favors for each other, and Jackson was of the opinion that Dodd always performed agreements which he had with him. In some cases Jackson would leave notes and checks signed in blank with Dodd to cover situations which might arise when Jackson would not be available to sign such documents. On occasions Dodd covered overdrafts at the bank for Jackson. Jackson, through his businesses, became the largest depositor in the East Chattanooga Branch of the Hamilton National Bank which Dodd managed. Jackson made personal *52 loans to various parties from time to time and Dodd assisted him in handling these loans. Sometimes during the years here involved Jackson turned over to Dodd the handling of his private loans. From time to time Dodd would account to Jackson for collections on these loans. As of December 31, 1945, the partnership, Jackson Manufacturing Company, was liquidated and a corporation under the name of Jackson Manufacturing Company was formed which took over the business previously operated by the partnership. The stock of the new corporation was issued to Jackson and Alice in exchange for assets turned over to the corporation. Jackson Manufacturing Company, a partnership, omitted sales from its partnership returns of income from which the distributable partnership income of Jackson and Alice was computed in the following amounts for the years indicated: Year
Amount
1942
$ 26,145.76
1943
224,865.72
1944
50,289.14
1945
8,232.94
Total
$309,533.56
Jackson Manufacturing Company, on its partnership returns of income from which the distributable income of Jackson and Alice was computed, omitted purchases from its cost of goods sold for the years 1942, 1943, *53 and 1944 in the amounts of $100, $49,000, and $900, respectively. The partnership did not omit any purchases from costs of goods sold on its return of income for the year 1945. Cleveland Chair Company omitted sales from its Federal income. declared value excess profits, and excess profits tax returns in the following amounts for the years indicated: Year
Amount
1942
$ 3,327.60
1943
203,131.41
1944
37,577.09
1945
11,808.74
Total
$255,844.84 The Cleveland Chair Company omitted purchases from its costs of goods sold for these same years in the respective amounts of $100, $49,000, $900, and none. Jackson and Alice each omitted from their reported income for the years 1942 through 1945 their distributive portion of the understatement of partnership income on the basis of 55 percent to Jackson and 45 percent to Alice. Jackson omitted income received from Cleveland Chair Company through withholding checks of that corporation to the extent of 55 percent of the withheld amounts less the amounts of omitted purchases, and Alice to the extent of 45 percent of such amount but limited by the available earnings and profits of Cleveland Chair Company. Jackson, *54 on his Federal income tax return for the year 1942, failed to report $12.90 of interest on his personal savings account and reported no interest for the years 1942 through 1947 on the various accounts in the name of Jolly Jewell, Herbert Jewell, John Jones, W. E. Wooten, and others. Alice failed to report interest from her personal savings account for the years 1942, 1943, 1944, and 1945 in the amounts of $31.60, $49.80, $99.15, and $103.40, respectively, and reported no interest for the years 1942 through 1947 from the various accounts in the names of Jolly Jewell, Herbert Jewell, John Jones, W. E. Wooten, and others. W. R. Jackson and Alice Jewell Jackson, for the years 1948 and 1949, reported no interest from the various accounts in the names of Jolly Jewell, Herbert Jewell, John Jones, and others as heretofore listed. The Jackson Manufacturing Company on its partnership returns of income reported income and claimed deductions for the years 1942, 1943, 1944, and 1945 as follows: 1942
Sales
$ 668,139.42
Cost of goods sold
Beginning inventory
$ 35,861.75
Purchases: Lumber
$ 51,115.03
Raw materials
174,384.19
Upholstering materials
196,904.38
Freight and express
11,830.66
434,234.26
Labor
104,669.13
Manufacturing expenses
13,424.88
$ 588,190.02
Less: Ending inventory
37,108.32
Total: Cost of goods sold
551,081.70
Gross profit on sales
$ 117,057.72
Less: Selling expenses
37,754.82
$ 79,302.90
Less: Operating expenses
11,900.67
$ 67,402.23
Plus: Other income
8,458.90
$ 75,861.13
Less: Other expense
17,929.88
Net book profit
$ 57,931.25
Plus: Partners' salaries
4,680.00
Contributions
619.00
Net income
$ 63,230.25
1943
Sales
$ 940,537.87
Cost of goods sold
Beginning inventory
$ 37,108.32
Purchases: Lumber
$107,411.09
Raw materials
206,401.17
Upholstering materials
244,379.73
Freight and express
20,412.62
587,604.61
Labor
171,859.09
Manufacturing expenses
21,267.01
$ 808,839.03
Less: Ending inventory
25,232.09
Total: Cost of goods sold
783,606.94
Gross profit on sales
$ 156,930.93
Less: Selling expenses
47,999.53
$ 108,931.40
Less: Operating expenses
13,370.65
$ 95,560.75
Plus: Other income
8,085.46
$ 103,646.21
Less: Other expense
19,010.09
Net book profit
$ 84,636.12
Plus: Partners' salaries
4,930.00
Contributions
459.00
Net income
$ 90,025.12 1944
Sales
$1,216,744.34
Cost of goods sold
Beginning inventory
$ 25,232.09
Purchases: Lumber
$ 80,982.67
Raw materials
282,291.89
Upholstering materials
389,903.80
Freight and express
26,021.28
779,199.64
Labor
170,437.82
Manufacturing expenses
23,819.11
$ 998,688.66
Less: Ending inventory
26,362.30
Total: Cost of goods sold
972,326.36
Gross profit on sales
$ 244,417.98
Less: Selling expenses
54,124.43
$ 190,293.55
Less: Operating expenses
15,644.29
$ 174,649.26
Plus: Other income
11,694.02
$ 186,343.28
Less: Other expense
24,824.80
Net book profit
$ 161,518.48
Plus: Partners' salaries
7,300.00
Contributions
1,433.00
Net income
$ 170,241.48
1945
Sales
$1,400,417.44
Cost of goods sold
Beginning inventory
$ 26,362.30
Purchases: Lumber
$101,118.34
Raw materials
277,592.05
Upholstering materials
527,003.66
Freight and express
24,110.02
929,824.07
Labor
195,035.57
Manufacturing expenses
23,802.59
$1,175,024.53
Less: Ending inventory
35,165.25
Total: Cost of goods sold
1,139,859.28
Gross profit on sales
$ 260,558.16
Less: Selling expenses
57,574.38
$ 202,983.78
Less: Operating expenses
14,880.26
$ 188,103.52
Plus: Other income
10,855.01
$ 198,958.53
Less: Other expense
29,250.72
Net book profit
$ 169,707.81
Plus: Partners' salaries
7,440.00
Contributions
918.25
Net income
$ 178,066.06
*55 The Cleveland Chair Company on its corporate income tax returns, from which its excess profits tax net income reported on those returns, and declared value excess profits tax net income reported on those returns was computed, showed income and claimed deductions for the years indicated as follows: 1942
Sales
$ 703,327.79
Less: Cost of goods sold
Beginning inventory
$ 92,814.06
Purchases
355,850.66
Salaries and wages
177,772.83
Other costs
9,887.28
$636,324.83
Less: Ending inventory
51,067.53
585,257.30
$ 118,070.49
Interest
7.45
$118,077.94
Less: Deductions
91,928.62
$ 26,149.32
Less: Declared value excess profits tax
405.86
Net income
25,743.46
Excess profits net income
$ 25,967.41
1943
Sales
$1,089,875.96
Less: Cost of goods sold
Beginning inventory
$ 51,067.53
Purchases
612,942.18
Salaries and wages
268,181.31
Other costs
14,681.18
$946,872.20
Less: Ending inventory
54,372.47
892,499.73
$ 197,376.23
Other income
2,902.29
$ 200,278.52
Less: Deductions
128,249.44
$ 72,029.08
Less: Declared value excess profits tax
0
Net income
$ 72,029.08
Excess profits net income
$ 72,029.08
1944
Sales
$1,301,397.96
Less: Cost of goods sold
Beginning inventory
$ 54,372.47
Purchases: Lumber
174,267.77
Raw materials
291,221.20
Upholstering materials
281,274.60
Freight and express
38,998.21
Labor
274,177.72
Manufacturing expenses
40,790.60
$1,155,102.57
Less: Ending inventory
70,943.73
1,084,158.84
$ 217,239.12
Selling, operating, and other expenses
121,219.86
$ 96,019.26
Other income
$ 8,620.94
$ 104,640.20
Less: Declared Value Excess Profits tax
306.25
Net income
104,333.95
Excess profits net income
104,333.95
1945
Sales
$1,648,764.11
Less: Cost of goods sold
Beginning inventory
$ 70,943.73
Purchases
1,043,006.26
Salaries and wages
273,400.04
Other costs
18,313.89
1,405,663.92
Less: Ending inventory
88,645.75
1,317,018.17
$ 331,745.94
Interest
1,276.59
Other income
475.72
$ 333,498.25
Less: Deductions
164,215.66
$ 169,282.59
Less: Declared value excess profits tax
2,922.65
Net income
$ 166,359.94
Excess profits net income
$ 166,359.94
*56 Respondent in his notice of deficiency increased the reported income from distributable partnership income of Jackson and Alice for the years and in the amounts as follows: Year
Jackson
Alice
1942
$ 16,339.18
$ 9,806.58
1943
125,772.64
99,093.08
1944
27,659.03
22,630.11
1945
4,605.12
3,627.82 Respondent increased the reported income of Jackson and Alice by the following amounts, stated to represent distributions from the Cleveland Chair Company: Year
Jackson
Alice
1942
$ 1,830.18
$ 1,497.42
1943 *
92,242.84
75,471.42
1944
20,667.40
16,909.69
1945
6,494.81
5,313.93 Respondent increased the reported income of Jackson and Alice for the years 1942, 1943, 1944, 1945, 1946, and 1947 by amounts stated to represent unreported interest as follows: Year
Jackson
Alice
1942
$ 12.90
$ 31.60
1943
169.79
188.71
1944
666.04
644.09
1945
416.04
443.79
1946
296.37
342.32
1947
252.69
428.65
*57 Respondent increased the income as reported on the joint Federal income tax returns of Jackson and Alice for the years 1948 and 1949 in the respective amounts of $956.97 and $610.53, stated to represent unreported interest income. Respondent determined that there were unreported sales of the partnership, Jackson Manufacturing Company, and the corporation, Cleveland Chair Company, all of which represented net income, for the years and in the amounts as follows: Jackson Manu-
Cleveland
Year
facturing Co.
Chair Co.
1942
$ 26,145.76
$ 3,327.60
1943
224,865.72
203,131.41
1944
50,289.14
37,577.09
1945
8,232.94
11,808.74
In the case of Cleveland Chair Company respondent determined deficiencies in declared value excess profits tax and excess profits tax based primarily on adding in as additional income the unreported sales as determined by respondent but also making certain minor adjustments which have not been contested herein, other than to the extent that petitioners contend the statute of limitations bars the assessment or collection of a deficiency for any of the years here involved. Respondent determined an addition to tax under *58 section 293(b) of the Internal Revenue Code of 1939 to be due from each petitioner in each year in which a deficiency was determined because a part of such deficiency was due to fraud with intent to evade tax and determined an addition to income tax for fraud to be due from Cleveland Chair Company for 1942 although no deficiency in tax for that year was determined. Ultimate Facts 1. W. R. Jackson filed false and fraudulent income tax returns for each of the years 1942, 1943, 1944, and 1945 with intent to evade tax and therefore assessment and collection of deficiencies in income tax from him for these years are not barred by the statute of limitations. Respondent has failed to show that the returns filed by W. R. Jackson for the years 1946 and 1947 were false or fraudulent with intent to evade tax. Therefore the assessment of any deficiency for these years is barred by the statute of limitations. 2. There is a deficiency in income tax due from W. R. Jackson for each of the years 1942, 1943, 1944, and 1945, some part of which is due to fraud with intent to evade tax. 3. Respondent has failed to prove by clear and convincing evidence that the returns filed by Alice Jewell Jackson *59 for any one of the years 1942, 1943, 1944, 1945, 1946, and 1947 were false or fraudulent with intent to evade tax and therefore the assessment or collection of any deficiency in tax from Alice Jewell Jackson for each of these years is barred by the statute of limitations. 4. Cleveland Chair Company filed false and fraudulent excess profits and declared value excess profits tax returns for each of the years 1942, 1943, 1944, and 1945, and a false and fraudulent income tax return for the year 1942, and therefore assessment and collection of deficiencies in these taxes for these years from Cleveland Chair Company are not barred by the statute of limitations. 5. There is a deficiency in declared value excess profits tax and a deficiency in excess profits taxes due from Cleveland Chair Company for each of the years 1942, 1943, 1944, and 1945, part of which is due to fraud with intent to evade tax. 6. W. R. Jackson and Alice Jewell Jackson have failed to prove that respondent erred in increasing their taxable income by unreported interest for each of the years 1948 and 1949. 7. Respondent has failed to establish that any portion of the deficiency due from W. R. Jackson and Alice *60 Jewell Jackson for either the year 1948 or 1949 was due to fraud with intent to exade tax. Opinion For all years here involved with respect to each petitioner, other than the joint liability of Jackson and Alice for the years 1948 and 1949, the assessment or collection of deficiencies is barred by the statute of limitations in the absence of fraud. The evidence with respect to Alice is not clear and convincing that she knew anything about the understatement of sales by Jackson Manufacturing Company or Cleveland Chair Company, or knew that checks in payment of accounts receivable were diverted from the companies' accounts. The record shows that her work for the companies was of a type which would not necessitate knowledge of the keeping of the books of the companies or of the amount of sales made by them. Respondent's primary argument that Alice's returns were false or fraudulent with intent to evade tax is based on the assumption that since she was a 45 percent owner in each business and since certain of the moneys obtained from the diverted sales were used to purchase assets for her such as her interest in the farm and 45 percent of the additional stock in Cleveland Chair *61 Company, it necessarily follows that she knew of the unreported income. At best, respondent's argument raises a suspicion that she might have known of the unreported income either from her general association with the businesses or from information furnished her by her husband. A suspicion is not the clear and convincing evidence needed to establish fraud. Since Alice did not file joint returns with her husband for the years 1942 through 1947 but filed separate returns, proof that Alice's husband's returns were false or fraudulent for any of these years is not clear and convincing evidence that Alice's returns were likewise false or fraudulent. United Dressed Beef Co. 23 T.C. 879 (1955). Alice did omit certain small amounts of interest on her personal savings account from her return, but the evidence does not show that her failure to furnish the accountant who prepared her returns with information as to the amount of this interest was intentional. Since the parties agree that the assessment or collection of any deficiency from Alice for any of the years 1942, 1943, 1944, 1945, 1946, and 1947 is barred by the statute of limitations in the absence of fraud, we hold that *62 respondent erred in his determination of any deficiencies against Alice for any of these years. The evidence is clear and convincing that the returns filed by Jackson and by Cleveland Chair Company for each of the years 1942, 1943, 1944, and 1945 were false and fraudulent with intent to evade tax and that some part of the deficiencies in each tax here in issue of Jackson and Cleveland Chair Company for each of these years was due to fraud with intent to evade tax. The evidence shows that Jackson as an officer of Cleveland Chair Company falsified the returns of that company with intent to evade tax. Such proof is sufficient to establish that the corporate returns were false and fraudulent. Auerbach Shoe Co., 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954), and United Mercantile Agencies, Inc., 23 T.C. 1105 (1955), affd. 238 F. 2d 735 (C.A. 6, 1956). Since the evidence shows that Jackson was responsible for the understatement of income both in partnership returns of income and the corporate returns, the proof of fraud with respect to Jackson's own returns and the corporate returns follows a similar pattern. Jackson admits *63 that the sales of both the partnership and the corporation were understated by the amounts of the customers' checks received by each which were not credited to gross sales of the businesses but contends that all the money obtained from the cashing of such checks was used for purchases of Black Market materials, the cost of which was not included in cost of goods sold as shown on the tax returns filed. Petitioner admits that the checks as analyzed by respondent were deposited to the various fictitious accounts and that withdrawals from these accounts were the source of funds for the purchase of Jackson's farm, Rome County bonds, stock in Cleveland Chair Company, and for similar personal purposes of Jackson. Petitioners contend and Jackson testified that he thought these funds were coming to him from other sources, primarily from loans arranged by Dodd. Jackson denied that he knew of the existence of these accounts, except the Thomas Rogers account and the Jackson and Wooten account. Jackson did not consider the Jackson and Wooten account as fictitious. Petitioner therefore speculates that when the checks were cashed Dodd used moneys otherwise available to him to give Jackson the cash *64 and then deposited the checks to the various fictitious accounts without Jackson's knowledge. The evidence is clear and convincing that the proceeds of a great number of the checks cashed which were not included in the gross sales of the businesses were not used for the purchase of materials on the Black Market but were diverted to Jackson's personal uses. Respondent has traced funds from the various accounts to the personal uses of Jackson as set forth in our findings of fact. Petitioners' only attempt to counteract this is to contend that Jackson thought the money was coming from Dodd through collections Dodd was making for him or through loans Dodd arranged for him, except as to the farm transaction where Jackson contends that he borrowed $40,000 from his father for use toward the purchase of the farm. We have not set forth in detail the various explanations which Jackson attempted to give since they are so inconsistent and confused as to be totally unworthy of belief. Jackson's testimony with respect to Wooten, a young man who at the time the Black Market purchases began was not over 25 years old, having been responsible for cashing of the checks of the two businesses in the *65 amounts here shown to have been diverted from gross sales is totally unbelievable. Wooten himself testified and he did not deny that when first interviewed by respondent's agents he had estimated that the total amount of cash from checks of Jackson Manufacturing Company and Cleveland Chair Company which he handled during the entire time he was working for Jackson's two companies prior to entering the service in April 1944, was between $75,000 and $100,000 and that he spent such amount in Black Market purchases. He said that he could not presently remember the amount he handled but if he had told respondent's agents it was between $75,000 and $100,000 when he was first interviewed, that would be his best recollection. At the trial he testified that he never handled more than $20,000 to $25,000 in cash for Black market purchases at any one time. The record shows total checks cashed far in excess of the $75,000 to $100,000 that Wooten estimated he spent for Black Market purchases. The record also shows checks to Jackson Manufacturing Company and Cleveland Chair Company which were not recorded in the receipts of these companies in excess of $25,000 clearing on a specific date in a number *66 of instances. For instance as of August 27, 1943, checks of the Jackson Manufacturing Company in amounts over $40,000 and of Cleveland Chair Company in amounts over $33,000 were cashed and there are other similar instances shown in the facts, as for instance the January 8, 1944, deposit to the Jolly Jewell account of $32,917.43 and the January 31, 1944, deposit of $35,984.48 of checks of Jackson Manufacturing Company to the Ralph Wooten account. Viewed in its entirety Wooten's testimony clearly shows that he cashed and spent in Black Market purchases only a small portion of the diverted funds. Jackson specifically denied personally spending any funds in Black Market activities other than the $25,000 deposited to the Thomas Rogers account which he admitted having some knowledge of and certain cash payments to a Yates Bleaching Company which he said were made by Dodd with funds he had left with Dodd. Jackson denied knowing how the obtaining of such funds left with Dodd was handled, claiming that the girl in his office by the name of Cavanaugh in some way handled it. We have not found fraud for the years 1946 and 1947 in the case of Jackson since, though we think the evidence is clear *67 and convincing that the funds from the cashed checks, except to the extent we have found that they went to purchase material on the Black Market, were diverted by Jackson to his personal use or for the benefit of himself and Alice, it is not equally as clear that Jackson knew that the funds were placed in fictitious savings accounts where they drew interest. It is clear that Jackson knew that Dodd was holding the proceeds of the cashed checks for him and that he could call on Dodd for the cash as he wanted it. The available deposit slips to the savings account were all in Dodd's handwriting. While this does not show that Jackson did not know of such accounts since the evidence shows that it is not uncommon for an employee or officer of the bank to make out such slips for a client, it does not establish that Jackson did know of such deposits. Though the record shows that Dodd was present in the courtroom during the entire trial, neither party chose to call him as a witness. Each party explained the failure to call Dodd by the fact that he, himself, had been the petitioner in a case before this Court involving the years 1942 to 1949, inclusive, in which we held that his Federal income *68 tax return for each of such years was false and fraudulent with intent to evade tax. [2]
Petitioners argue that the fact that there were no deposits of cashed checks to fictitious accounts after January 31, 1944, even though Jackson continued in a high tax bracket thereafter, indicates that all of the moneys were being spent for Black Market activities. No such conclusion follows. The explanation of the reduced activities in cashing of company checks is more likely tied in with stronger controls which gradually the certified public accountant who audited the books of the two businesses kept over the books after being called in when Jackson became concerned that perhaps $43,000 of the sales had been diverted by Wooten for his own purposes. Petitioners, in arguing that respondent has failed to meet his burden of proof, rely primarily on Richardson v. Commissioner, 264 F. 2d 400 *69 (C.A. 9, 1959), affirming in part and reversing in part a Memorandum Opinion of this Court. In reversing our opinion as to the fraud issue the Circuit Court relied on Valetti v. Commissioner 260 F. 2d 185 (C.A. 3, 1958), and quoted from that case the following language: It is not enough that an apparent discrepancy between the large commissions shown by the taxpayer's records and the smaller commissions said to have been paid by other chandlers permitted, though it did not require, an inference of error in the taxpayer's records. This permissive inference was not an adequate base upon which to build a second inference that the inferred error was made with fraudulent intent to evade income taxes, in a situation where this ultimate conclusion had to be established in a clear and convincing way. Petitioners specifically rely upon the following language from Richardson v. Commissioner, supra (p. 405): We cannot agree that the finding of an understatement of gross receipts automatically puts on the taxpayers the obligation to prove the offsetting deductions in order to escape a fraud penalty. Such a contention might have more force in a case where the unreported *70 income and deductions were unrelated or only remotely related. There, the Tax Court might be justified in thinking that the newly asserted deductions were conceived belatedly in an effort to add to the Commissioner's burden. It might reasonably be contended in such a case that the taxpayer should have the burden even on the issue of fraud. We have no occasion to decide this, however, for here the unreported income and the unclaimed deductions are intertwined. We think that the failure to report these two items is not a sufficient ground upon which to distinguish the instant case from Valetti and thus to lessen the burden on the Commissioner. In order for a fraud penalty to be assessed where the unreported items of income and expense are closely related, the Commissioner must prove that at least some unreported net income resulted from the unrecorded transactions. This principle was applied in the Tax Court in H. J. Feinberg & Co., Inc., 9 T.C.M. 776 (1950). In the instant case respondent has traced a goodly portion of the moneys from the cashed checks directly into uses for personal purposes of Jackson and Alice and Jackson has offered no explanation which is worthy *71 of belief of how these moneys were available for his personal use. The credible evidence of record shows that not over $100,000 of Black Market purchases for the two businesses were omitted from purchases during the years 1942, 1943, and 1944, and that no such accounts were omitted in 1945. The credible evidence also shows that most of the Black Market purchases were entered on the books during 1942 when company checks were being written to cash and lumber bought on a basis of upgrading. These facts, proved by respondent by clear and convincing evidence, sufficiently distinguish the instant case from Richardson v. Commissioner, supra, to make Richardson v. Commissioner, supra, inapplicable. See United States v. Bender, 218 F. 2d 869 (C.A. 7, 1955), certiorari denied 349 U.S. 920 (1955); Paul Masters, 25 T.C. 1093 (1956), affd. 243 F. 2d 335 (C.A. 3, 1957); and Davis v. United States, 226 F. 2d 331 (C.A. 6, 1955). In addition to the Thomas Rogers account, Jackson admitted knowledge of the W. E. Wooten and W. R. Jackson account but contended that this account was set up for the signatures *72 of Wooten and himself to use for making loans to employees and that it was closed out after he was advised that this might be objectionable to the labor unions. It will be noted that no withdrawal from this account was made from the time it was opened on March 25, 1942, with a $107.25 deposit until it was closed on June 17, 1942, by the withdrawal of the entire $5,539.65 which had been deposited in it. On that same date the John Jones account was opened with a deposit of $5,708. We have found that the amount withdrawn at the closing of the W. E. Wooten and W. R. Jackson account made up that portion of the deposit to the John Jones account. This is one of the few items of deposits to these various accounts which petitioners to some extent question as distinguished from contending, that all of these transactions, although in fact correctly shown by respondent, occurred without Jackson's knowledge. In this particular instance, petitioners in their reply brief state: It could be speculated that at the time this account was closed at the height of the Black Market purchase activity during 1943, cash was requested, which was supplied by Dodd from his side fund, and he in turn deposited *73 the check closing out the Wooten and Jackson account to the John Jones account which he controlled. Irrespective of the speculation as to the disposition of the funds when the account was closed out, it is absolutely clear that no withdrawals from the account were made to make loans to employees at any time while it was maintained and therefore the proven facts do not bear out petitioners' explanation of this account. Petitioners likewise attack the bank records and point to a number of instances where entries are out of sequence or some correction has been made by a strikeover or change of a figure in ink, or some such similar irregularity exists. There are irregularities in the bank records which appear to be the type that efficient management should not permit, but these irregulaties do not explain the money withheld from sales by Jackson. In considering the fraud aspects of the case, we have only considered the checks which were endorsed by Jackson Manufacturing Company and Cleveland Chair Company which were diverted from the businesses by Jackson since, other that by inference, respondent has not shown the source of the other funds which he has included in computing the *74 omitted income of each of these businesses. As shown in our findings of fact the amounts of the checks specifically identified by respondent as not included in gross sales of the businesses are $302.05. $166,598.04, $40,675.02, and $8,232.94 for the Jackson Manufacturing Company for the years 1942, 1943, 1944, and 1945, respectively, and $3,285.69, $202,116.82, $37,577.09, and $11,689.86 for the Cleveland Chair Company for these same years. These amounts far exceed Wooten's estimate of total Black Market purchases and also exceed any amounts which might appear to have been omitted from purchases on the basis of evidence which petitioners argue inferentially establishes that there were some Black Market purchases. Jackson testified that upholstery material on the average represented 25 percent of the sales price of the products. The evidence shows that the purchases of upholstery material by Jackson Manufacturing Company as reported on its partnership returns of income for the years 1942, 1943, 1944, and 1945 were $196,904.38, $244,379.73, $389,903.26, and $527,003.66, respectively. A computation of 25 percent of partnership sales as determined by respondent for the years 1942, 1943, *75 1944, and 1945 results in $175,573.29, $291,352.90, $316,758.36, and $352,162.62, respectively. If only the checks endorsed by Jackson Manufacturing Company are added into sales, 25 percent of the amount of such increased sales obviously comes to even less. It is readily apparent that in only the year 1943 do the purchases of upholstery materials as shown on the partnership returns of income amount to less than 25 percent of the sales shown or the sales as determined by respondent. When the $49,000 we have determined as the amount by which cost of goods sold was understated in 1943 is added to the purchases of upholstery materials as shown on the partnership return of income for the year 1943, the resultant figure is slightly over 25 percent of the amount which respondent determined as partnership sales for that year. Since the change in inventory of materials was very slight, the purchases of such materials must closely approximate the cost of materials used. The figure for purchases of upholstery materials as a separate item on the income tax returns for Cleveland Chair Company is not shown for any year except 1944 and the effect of inventory changes might well be to distort any *76 comparison of purchases of upholstery materials to sales for the one year. For that year the purchases on the corporate income tax return show "Raw Materials" as $291,221.20 and "Upholstery Materials" as $281,274.60. The evidence clearly shows that the largest one item of material costs in the manufacture of furniture by Cleveland Chair Company as well as Jackson Manufacturing Company is upholstery materials. Therefore, a substantially larger portion of the $54,372.47 of the opening inventory of materials than of the $70,943.73 closing inventory must have consisted of upholstery material to make this item the largest item of material costs. The comparison of statistical data of industry percentage of net profit to sales with similar data for the businesses of Jackson Manufacturing Company and Cleveland Chair Company likewise tends to demonstrate that not all the withheld sales were omitted from cost of goods sold. Jackson's two businesses did consistently better than the industry average and it is noted that in 1946 and 1947 when Jackson does not contend there were any Black Market purchases, the Cleveland Chair Company and Jackson Manufacturing Company further exceeded the industry *77 increase than in the years 1942 and 1944 as adjusted by respondent. Therefore, this comparison tends to show that there was a very small amount of Black Market purchases omitted from the records of Jackson Manufacturing Company and Cleveland Chair Company in the years 1942 and 1944. Wooten testified that the Black Market purchases which were omitted from the purchase records were small in 1942, greatly increased in 1943 and that he ceased to make such purchases for the partnership and corporation when he went into the service. We have accepted his estimate of the total purchases which he made being between $75,000 and $100,000 and have used the $100,000 figure since Wooten testified with respect to a $25,000 purchase which he had arranged for but for which Jackson was to pay. Jackson's own testimony is that other than this one purchase he made no Black Market purchases. From this evidence and the comparison of figures for the various years, we have concluded that there were omitted purchases by each Jackson Manufacturing Company and Clevlland Chair Company of $100 in 1942, $49,000 in 1943, and $900 in 1944. Petitioners contend that respondent has failed to show fraud in the case *78 of Jackson because he did not confirm his determination of omitted income by a net worth computation showing Jackson's yearly increases in net worth. Although fraud may be established by net worth computations with a likely source for the increases, where the evidence shows specific omission of income, such a computation is not necessary to establish fraud by clear and convincing evidence. Emilie Furnish Funk, 29 T.C. 279, affirmed and remanded on another issue sub nom, Furnish v. Commissioner, 262 F. 2d 727 (C.A. 9, 1958). Petitioners further contend that since both Jackson Manufacturing Company and Cleveland Chair Company were on an accrual basis of accounting, respondent has not established that the omitted sales represented income in the years in which the checks were cashed. This is true with respect to certain checks shown to have been cashed in the early part of each of the years 1943 and 1944 because the evidence shows that generally during the years here involved accounts were paid within 30 days and sometimes within 60 days. However, in each of the years here involved there are sufficient amounts of checks cashed more than 60 days after the beginning *79 of the years to show income diverted from the companies to Jackson's own use. Petitioners finally rely on certain testimony as to Jackson's reputation. Several witnesses were asked about Jackson's reputation for character and integrity, and they stated that his reputation was of the highest. However, these witnesses did not profess to know that Jackson was dealing in the Black Market and one such witness, George Castings, Vice President of the Cleveland National Bank in Cleveland, Tennessee, where during the years 1942 through 1945 the payroll account of the Cleveland Chair Company was carried, stated that he had never heard of Jackson's dealings in the Black Market to any extent at any time including the war years and that he had been in a position to have heard if it had been a fact that Jackson was dealing in the Black Market. It is likewise significant that at the time that respondent's agents were making their investigation of petitioners' tax liability, Jackson furnished them with no names of either individuals or firms from which Black Market purchases had been made to permit them to check the amount of such purchases. At the trial of the case several names were mentioned *80 by Jackson and Wooten as persons from whom Black Market purchases were made but no such person was called as a witness and Jackson generally testified that he did not know where presently to locate these individuals. There was testimony about unsatisfactory Black Market purchases from a man by the name of Kaufman by both Wooten and Jackson, but Jackson proceeded to attempt to explain later Black Market purchases as having been made from this same individual. Petitioners point out that over-ceiling prices paid for Black Market goods have been held to be includable in cost of goods sold in computing taxable income, citing such cases as Lela Sullenger, 11 T.C. 1076 (1948). We have made allowance for the maximum amount the record supports as Black Market purchases omitted from purchases on the records of Jackson Manufacturing Company and Cleveland Chair Company in our computation and there still remains substantial withholdings from sales that are not thus accounted for. Petitioners stress the limited formal education of Jackson and argue that he did not understand accounting. Jackson's understanding of the cost sheets of his businesses show that he had a fair understanding *81 of accounting. The record is completely clear that Jackson understood that he was taxable on his distributable share of the partnership income and that such income included all partnership receipts even though he kept such receipts for his own use. The evidence is clear and convincing that Jackson's income tax returns for the years 1942, 1943, 1944, and 1945 and the declared value excess profits and excess profits tax returns of the Cleveland Chair Company for these same years and the income tax return of Cleveland Chair Company for the year 1942 were false and fraudulent with intent to evade tax. Since respondent has not shown by clear and convincing evidence that Jackson did know of the interest being drawn on the fictitious accounts in which his money was being deposited, respondent has failed to show by clear and convincing evidence that Jackson's returns for the years 1946 and 1947 were false or fraudulent with intent to evade tax. Having determined that respondent has shown by clear and convincing evidence that the returns of Jackson and Cleveland Chair Company for the years 1942 through 1945 were false and fraudulent with intent to evade tax, there remains the question *82 of the proper computations of taxable income for each of these petitioners for these years. It is unnecessary to go into this aspect of the case with respect to Alice for any of the years 1942 through 1947 or with respect to Jackson for the years 1946 and 1947, since we have determined that respondent has failed to show by clear and convincing evidence that the returns filed by Alice for the years 1942 through 1947 and the returns filed by Jackson for the years 1946 and 1947 were false or fraudulent with intent to evade tax and therefore assessment or collection of a deficiency is barred for those years. Respondent in his determination included in the income of Jackson Manufacturing Company all unidentified deposits to the various fictitious accounts including the W. E. Wooten and W. R. Jackson account, which petitioners do not view as fictitious and checks cashed where the last endorsement was by W. R. Jackson, Ray Jackson or Lee Jackson as well as all checks to Jackson Manufacturing Company which were not deposited to that company's account. For the proof of fraud by respondent we have not considered that it had been sufficiently established that Jackson knew the funds from the *83 checks which were cashed by him were being placed in these accounts, as distinguished from being held in cash by Dodd, who Jackson himself testified, and certain related evidence indicated, was handling certain collections of personal loans for Jackson. However, there is certainly no reliable evidence in the record to establish that these various accounts did not in fact belong to Jackson. The only evidence in this regard is Jackson's own statement which we consider unworthy of belief upon observation of Jackson as a witness and a consideration of all his testimony. The evidence of checks endorsed by Jackson Manufacturing Company and Cleveland Chair Company and by Jackson personally being deposited in these accounts is certainly strong if not clear and convincing that Jackson knew of these accounts and that all funds therein belonged to him. Furthermore, the evidence is clear that respondent did not obtain all transit letters and that transit letters did not include local checks. It is therefore highly probable that the unidentified deposits in these accounts came from checks representing sales by Jackson Manufacturing Company and Cleveland Chair Company which were not recorded. *84 In any event the burden of proof as to the amount of deficiency is on petitioners, and petitioners have totally failed to carry this burden. Respondent has allowed as transfers between accounts all amounts of withdrawals which are in equal sums or approximate sums or deposits on the same day to another account. In this state of the record we sustain the amount of respondent's addition to sales of the two companies, and except for the reduction by the amounts of purchases which we have found were omitted from the companies' records sustain respondent's computation of the resulting increases in income. We hold that 55 percent of the increased income of Jackson Manufacturing Company so computed for each of the years 1942 through 1945 is includable in Jackson's income as distributable partnership income. We likewise sustain respondent in including in Jackson's income for each of these years, 55 percent of the additional income of Cleveland Chair Company but in accordance with respondent's determination limited to the amount to which the 55 percent is applied does not exceed the available earnings and profits of that corporation. Since all parties agree that at the time the notices *85 of deficiencies were issued the statute of limitations on the assessment or collection of deficiencies from Jackson and Alice for the years 1948 and 1949 had not expired, we hold that petitioners have failed to show error in respondent's addition to the income as shown on the joint returns of Jackson and Alice for those years of the interest on the various fictitious accounts. However, since respondent has not shown by clear and convincing evidence that Jackson and Alice did know of the interest as distinguished from knowing that the cash was being held, we have found that no portion of such deficiencies was due to fraud with intent to evade tax. The circumstances shown certainly arouse suspicions that petitioners, Jackson and Alice, must have known of the accounts and have known that these accounts were drawing interest but suspicions are not sufficient for a finding of fraud. We hold that respondent correctly determined the deficiencies in the joint income tax liability of Jackson and Alice for the years 1948 and 1949 but has failed to establish that any part thereof was due to fraud with intent to evade tax. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: William R. Jackson and Alice J. Jackson, Docket No. 70812; Cleveland Chair Company, Docket No. 70813; and Alice Jewell Jackson, Docket No. 70814.↩
*. Income and victory tax.↩
1. Lee Jackson is a brother of W. R. Jackson and was the superintendent of the Jackson Manufacturing Company's factory during the years here involved. ↩
2. W. R. Jackson was sometimes called Ray Jackson.↩
*. The distribution included by respondent in 1943 was limited by available earnings and profits of Cleveland Chair Company as computed in the deficiency notices.↩
2. E. C. Dodd, T.C. Memo. 1962-235, dated October 5, 1962. Petitioners also in this connection refer to the cases of United States v. Lefkoff, 113 F. Supp. 551 (E.D. Tenn., S.C. 1953), and Lefkoff v. Darr, an unreported case (C.A. 6, Dec. 17, 1953), 1954↩ P.H., par. 72356, 54-1 U.S. T.C., sec. 9293.